[No. 590-42270-3.    Division Three.    February 23, 1973.]

NELLIE E. NERBUN, *as Executrix, Appellant,* v. THE STATE OF WASHINGTON *et al., Respondents.*

R. G. *Schimanski* and *O. E. Vordahl*, for appellant.

*Slade Gorton, Attorney General,* and *Joseph S. Monte-cucco, Assistant,* for respondents.

GREEN, C.J.—In the course of demolition of wooden false-work used in the construction of a dual-span concrete bridge over Latah Creek near Spokane, Russell S. Nerbun was killed. This action for wrongful death was brought by his wife, Nellie E. Nerbun, as executrix of his estate, against defendants, State of Washington; Jerry Hagan, Director of Labor and Industries; Ralph E. Smith, Chief Safety Inspector; and John A. White, Safety Division Inspector. From a judgment in favor of defendants, plaintiff appeals.

This case was tried to the court sitting without a jury, after which the following findings of fact were entered:

1. Plaintiff is the duly authorized, appointed and acting Executrix of the estate of Russell A. Nerbun, deceased, having been appointed by order of the Court.

2. That on the 21st day of December, 1962, Jerry Hagan was the duly authorized, appointed and acting Director of the Department of Labor and Industries for the State of Washington; that on said date Ralph E. Smith was the duly authorized, appointed and acting Chief Safety Inspector in the Eastern Sector of the State of Washington for the Division of Safety, Department of Labor and Industries, State of Washington; and that on said date John A. White was a duly authorized, appointed and acting Safety Inspector working under Ralph E. Smith.

3. That on December 21, 1962, John A. White was the Safety Inspector for the Safety Division, Department of Labor and Industries assigned to the construction project known as "Latah Creek Bridge Job".

4. The "Latah Creek Bridge Job" involved construction of a dual span concrete structure to carry vehicular traffic to and from the City of Spokane and at the highest point was some 120 feet from the ground level.

5. The general contractor for the construction project

was Puget Sound Bridge and Dry Dock Co. and at the time of his death Russell S. Nerbun was an employee of said company.

6. During the construction period the concrete portion of the structure was supported by falsework which involved the use of heavy timbers and cross-bracing.

7. On December 21, 1962, Floyd Graves was superintendent of the job for Puget Sound Bridge and Dry Dock Co.

8. Approximately 30 days prior to the accident which claimed the life of Russell S. Nerbun, Floyd Graves informally outlined to defendant White a new and untried method conceived by Mr. Graves for dismantling some of the high falsework, which involved cutting certain line girths and sway braces and applying a lateral pull to the bottom of the falsework structure causing it to collapse. *Defendant White did not approve the plan suggested by Mr. Graves, did not fully understand how the procedure was to be carried out, and indicated to Mr. Graves at the time that he wanted to be present before any such plan was attempted.*

9. *On December 17, 1962, Mr. White and Cecil Kenney, a fellow inspector with the Department of Labor and Industries, were on the job site and discussed the method of demolition of the falsework with Bill Clarey, pilebuck foreman. Mr. Clarey indicated that the demolition of the falsework would be from the top down, that is, by placing a crane on the completed structure and removing the falsework piece by piece from the top.*

10. On December 20, [sic] 1962, without first contacting Mr. White, Mr. Graves gave orders to Junior Russell, foreman, to have workmen proceed to cut the sway braces and line girths in Span 5 in accordance with the new and untried method. The foreman chose Russell S. Nerbun and Leo Forrester as the individuals who were to cut the sway braces and line girths.

11. During the course of the cutting by the two workmen, Mr. Graves realized that his instructions were not being followed and that many more sway braces and line girths were being cut than he had intended. He thereafter gave corrective instructions to the foreman in an effort to bring the work being done in line with his plan of dismantling. The cutting being done required the workmen to work out of a rectangular shaped box known

as a "Jilly" which was suspended by two cables from a hook on the end of the boom of a large mobile crane. One man would hold the "Jilly" close to the falsework structure while the other used a power saw to cut the sway braces and line girths.

12. During the conversation between Mr. White and Mr. Graves approximately 30 days prior to the date of the accident, Mr. White stated he would not permit any method which required the workmen to be inside of the falsework structure. Just prior to the accident Mr. Graves learned that the men were working inside of the falsework structure and he informed the foreman this was not to be done. In disregard of these instructions the foreman permitted the men to work inside of the false-work structure. At the time of the accident, the men were working inside the structure at approximately the 60 foot level. Mr. Forrester was holding the "Jilly" close to the structure by wrapping his arms around one of the verticle [sic] timbers. Mr. Nerbun was cutting one of the supports with the power saw. As he completed his cut the structure shifted momentarily and then the portion above the men suddenly collapsed upon them snapping one of the steel cables which suspended the "Jilly" from the boom. Mr. Nerbun was thrown immediately to the ground and the collapsed portion fell upon him. Mr. Forrester stayed with the "Jilly" for a longer period and when finally thrown from it fell coming to rest on top of the collapsed structure. At this time Mr. White still had not been informed that the new and untried method was being carried out, nor was he on the job site at the time.

13. As a result of the accident, Mr. Nerbun died almost instantly and Mr. Forrester received serious bodily injury including broken arms, legs, pelvis, internal and back injuries.

14. The plan conceived by Mr. Graves which ultimately led to the death of Mr. Nerbun and serious injury to Mr. Forrester was not approved by Mr. White nor anyone representing the Safety Division of the Department of Labor and Industries.

15. At the time of the accident, the men were working in the "Jilly" without safety lines or hand rails.

(Italics ours.)

■ The only errors assigned to these findings of fact

are directed to the italicized portions of No. 8 and No. 9. No error having been assigned to the other findings, they become verities. *Weiss v. Weiss,* 75 Wn.2d 596, 597, 452 P.2d 748 (1969). We have reviewed the record submitted to us on appeal and find that in all material respects findings of fact No. 8 and No. 9 are supported by substantial evidence; they will not be disturbed. *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959).

The court concluded that the proximate cause of the death of Russell S. Nerbun was the negligence of the contractor in permitting the decedent to cut more sway braces and line girths than planned and permitting him to operate inside the falsework. No error is assigned to this conclusion.

However, plaintiff contends the court erred in concluding that none of the defendants was negligent. The court found the state inspectors were on the premises and were told by the pilebuck foreman the demolition was to be piece by piece from the top down. Three days later, without notifying defendants, the contractor ordered the demolition to take place by the new untried method. This method had not been approved and was not fully understood by defendants. The contractor was told that if the untried method were to be used defendant White wanted to be present before it was attempted and in no event would a workman be allowed inside the falsework under any method. All of these conditions were violated by the contractor.[1] In light of these findings, we conclude the court correctly determined that defendants were not negligent.

It is argued the defendant inspectors were negligent as a matter of law in their failure to discover by inspection the negligent activity of the contractor. Plaintiff takes the position that the duty to inspect provided for in RCW 49.16.050[2] and RCW 49.16.120[3] imposes an absolute

---

[1] It is noted the untried method was drawn on a napkin by the contractor's superintendent as it was discussed with defendant White and later thrown away.

[2] RCW 49.16.050:

"For all other work than coal mining, the director of labor and

duty upon the Department of Labor and Industries to insure and establish a safe place for workmen to be employed. We do not so construe these provisions.

To meet the standard claimed by plaintiff would require the state to have a safety inspector on duty at all times at every place where work covered by the Department of Labor and Industries was being performed. The testimony shows that in 1962 there were in excess of 980,000,000 man-hours of exposure with a safety·division staff of 44 inspectors. Defendant White testified he was responsible for 1,200 places of business in his assigned area, excluding construction work. RCW 49.16.120 only requires an inspection "as often as it is deemed necessary, but not less than once every year"—a kind of spot check. Additionally, RCW 49.16.151 provides that a penalty of not to exceed $1,000 shall be collected from an employer who refuses or fails to

---

industries through the division of safety, in accordance with the principles laid down in sections 6604-50, 6604-51, and 6604-52, shall make, and may from time to time modify, and shall promulgate standards of safety, to wit:

"(1) To make safe the place of work of workmen, same to be termed 'safe place standards';

"(2) Of safety devices and safeguards to make safe machines, tools, apparatus and appliances, same to be termed 'safety device standards';

"(3) Of educational systems for the education and training of employer and workman in the appreciation and avoidance of danger and in the maintenance and use of safe place and safety device standards.

"The director of labor and industries through the division of safety, shall make, and may from time to time modify, and shall promulgate rules and regulations for the enforcement of the use of such standards of safety."

[3]RCW 49.16.120:

"It shall be the duty of the director of labor and industries, through and by means of the division of safety to enforce the safe place, safety device and educational standards and orders, to inspect the establishment or work of every employer engaged in extrahazardous work (other than coal mines) as often as it is deemed necessary, but not less than once every year, for the purpose of ascertaining whether the safe place, safety device and educational standards applicable thereto are being complied with and to investigate and analyze all serious accidents to workmen in order to provide a remedy to prevent a repetition of the same, not only in the establishment in which the accident occurred, but also in all other like establishments."

comply with safety standards of the department *for a period of 30 days* after having written notice. In the instant case, the contractor, without notice to or approval of defendants, changed his method of demolition in the course of 3 days. We do not believe the legislature intended to impose an absolute duty upon the Department of Labor and Industries to insure a safe place for workmen to be employed. The most the legislature intended was that the department prescribe safety standards and secure some reasonable compliance through spot check inspections. In this way the safety conditions for workmen in general would be improved. The relatively small staff provided for the department is indication of this legislative intent. The situation is akin to those cases where a city is not held liable because the police department and its officers failed to enforce an ordinance. *Fluckiger v. Seattle,* 103 Wash. 330, 174 P. 456 (1918); *Goggin v. Seattle,* 48 Wn.2d 894, 297 P.2d 602 (1956). Plaintiff's contention must fail.

It is also urged that the negligence of the independent contractor is imputed to the State of Washington as owner of the premises on the theory the latter had a nondelegable duty to protect the decedent from negligent activity because the construction of the bridge was inherently dangerous. This theory of liability is an exception to the general rule that a principal is not liable for the negligence of an independent contractor. *See* 23 A.L.R. 1016, 1084 (1923); Restatement of Torts (Second) § 409 *et seq.* (1965); W. Prosser, *Law of Torts* (4th ed. 1971).[4] Dispositive of plaintiff's contention is the fact that this theory was never presented to the trial court. Prior to trial plaintiff filed a notice of trial amendment that would have allowed presentation

[4] Plaintiff also cites: *Kendall v. Johnson,* 51 Wash. 477, 99 P. 310 (1909); *Freebury v. Chicago, M. & P.S. Ry.,* 77 Wash. 464, 137 P. 1044 (1914); *Thompson-Cadillac Co. v. Matthews,* 173 Wash. 353, 23 P.2d 399 (1933); *Potts v. Amis,* 62 Wn.2d 777, 384 P.2d 825 (1963); *Barnecut v. Seattle School Dist. 1,* 63 Wn.2d 905, 389 P.2d 904 (1964); *Hartman v. Port of Seattle,* 63 Wn.2d 879, 389 P.2d 669 (1964). All of these cases are factually distinguishable from the case at bar.

of this theory. However, the allegations contained in the amendment were ordered dismissed as follows:

Motion to dismiss State of Washington as to any and all allegations and contentions against any and all officers, agents, employees, contractors, subcontractors of the State of Washington Department of Highways and Highway Commission arising out of the death of Russell S. Nerbun December 21, 1962 is granted with prejudice.

The evidence presented at trial, the findings of fact entered by the court and the findings proposed by plaintiff all confirm that the trial was presented on the theory of negligent inspection by the Department of Labor and Industries through their inspectors. No error having been assigned to the order dismissing the allegations supporting the theory now urged, it will not be considered. CAROA 42.

Plaintiff's proposed findings conflict with the findings that were entered. The failure to give them need not be considered because the court's findings to which error is assigned are supported by substantial evidence and the remainder are verities. *Erdmann v. Henderson,* 50 Wn.2d 296, 311 P.2d 423 (1957).

The error assigned to the court's conclusion that defendants could not be held liable for negligence because their activities were discretionary is unnecessary to the disposition of the case and therefore will not be considered.

Judgment affirmed.

MUNSON and McINTURFF, JJ., concur.

Petition for rehearing denied March 27, 1973.

Review denied by Supreme Court May 23, 1973.