ROBERT DOUGLAS CAMPBELL, *as Executor, Respondent* v.
THE CITY OF BELLEVUE, *Appellant.*

ROBERT DOUGLAS CAMPBELL, *as Executor, Respondent,* v.
RICHARD SAUNDERS, *Petitioner.*

*Skeel, McKelvy, Henke, Evenson & Betts* and *Frederick V. Betts* and *Douglas S. Dunham,* for petitioner.

*McCutcheon, Groshong, Geisness & Day* and *W. Ronald Groshong* and *R. George Ferrer* (of *Montgomery, Purdue, Blankinship & Austin*), for respondent.

HAMILTON, J.—The foregoing causes, an appeal and a petition for a writ of certiorari, were consolidated for argument and disposition.

The principal cause, a wrongful death and personal injury action, was initiated by the plaintiff (respondent) Robert D. Campbell, as executor of his deceased wife's estate and as guardian of his minor son Eric, claiming that agents of the City of Bellevue negligently executed their duties under pertinent electrical codes. From an adverse judgment, the City has appealed.

We affirm the judgment.

The facts are somewhat unusual. The plaintiff, his wife and family lived in close proximity to a creek running through the property of a neighbor, Mr. George L. Schafer. The Schafer premises had electric lights in and about the creek, which had been placed there some years before. These lights were controlled by switches in the Schafer residence and a circuit breaker in the garage. In the late fall of 1970, there was a fire next to the wiring on one of the light fixtures. Mr. Campbell advised the caretaker of

the Schafer residence, Mr. James Struebing, of the bareness of wires in proximity to the fire. He did not notify the City building department. Subsequently, he noted that corrective measures had been taken.

On March 15, 1971, a dead raccoon was observed in the creek. The police were notified and when the responding officer arrived, he noted that when a neighbor of the Campbells sought to extract the raccoon from the creek she received an electrical shock. Later, when the Schafers' caretaker undertook the task of removal, he said the stream was still "hot" whereupon he returned to the Schafer residence and turned off the circuit breaker, following which the raccoon was retrieved. Mr. Campbell and his neighbor, Mr. Robert Hanson, testified they telephoned the City's building department and talked with Mr. Andrew Sharpe, the electrical inspector, concerning the electrocution of the raccoon. Mr. Campbell also stated he informed Mr. Sharpe of the 1970 fire incident. Mr. Sharpe denied any telephonic conversation with Mr. Campbell and could not recall talking to Mr. Hanson, testifying, however, that he received a message on the morning of March 16, 1971, concerning the incident.

At about 9:30 a.m. on March 16, Mr. Sharpe and his administrative supervisor went to the Schafer premises and inspected the outdoor wiring. At this time, Mr. Sharpe observed that the wiring leading from the house to a light fixture in the creek did not conform to electrical code requirements and that it was deteriorated at the creek bank. He made tests and found that the wiring was not then electrically energized. This inspection consumed approximately 20 minutes during the course of which Mr. Sharpe did not determine the nature and extent of the outdoor lighting system which included several underwater lights and floodlights along both banks of the stream, as well as considerable underwater wiring. Since no one was then home, a red tag was affixed to the front door of the residence advising that: "Wiring running thru creek is unsafe

and constitutes a threat to life. This situation will have to be corrected immediately or the service will be disconnected." No action was taken to sever or otherwise disconnect the outdoor wiring, and no corrective measures were specified on the red tag.

The next morning Mr. Sharpe had a telephone conversation with the caretaker, although Mr. Sharpe thought he was talking to Mr. Schafer. He emphasized the danger and that the outdoor wiring had to be disconnected and not further utilized until it had been properly installed and inspected. He was assured this would be done and, according to Mr. Hanson, he reassured him that the problem had been corrected. Thereafter, and before August 6, 1971, Mr. Sharpe made no further inspection, stating that although he drove past the property on several occasions, it appeared that the premises were unoccupied.

The caretaker, in response to the red tag and to his telephone conversation with Mr. Sharpe, switched off the last two circuit breaker switches on the circuit breaker panel and placed electrical tape over them. He stated he followed this procedure because he did not know which of the two switches controlled the outdoor lighting system and an electrically operated garage door. Thereafter, when it was necessary to open the garage door, both switches were turned on.

On August 6, 1971, the caretaker opened the garage door for the purpose of unloading and storing furniture in the garage. During the unloading process, the switches remained on. In the meantime Eric Campbell, age six, and a cousin were playing by the creek. Eric slipped into the creek and received a paralyzing electrical shock. His cousin summoned Eric's mother, Barbara Jean Campbell, who, in attempting to rescue Eric, received a similar electrical shock and fell into the stream. Upon removal from the stream Eric survived; his mother did not.

This action was instituted against Mr. Schafer, the caretaker, Mr. Struebing, and the City. Prior to trial, Mr. Schafer and Mr. Struebing were voluntarily dismissed on

the basis of a covenant not to sue, the proceeds of which settlement were to be credited against any ultimate judgment. The action then proceeded against the City. Allegations of negligence against the City revolved principally about claims that the electrical inspector, Mr. Sharpe, inadequately inspected the outdoor lighting system following the raccoon incident, failed to then sever or otherwise disconnect the system, failed to follow up on corrective measures, and ill advisedly assured the Campbells through the neighbor, Mr. Hanson, that the situation had been corrected.

In support of the allegations, evidence was admitted to the effect that under the circumstances: (1) a more thorough inspection on March 16, 1971, would have revealed the extensive underwater wiring and further nonconformity with electrical code requirements increasing the dangerous propensities of the system; (2) the City's electrical code and standards of electrical inspection practice in the community required that the lead wire to the system be severed and redtagged; and (3) the State and City electrical codes fixed specific times within which corrective action be taken and standards of electrical inspection practice prescribed a definite follow-up procedure.

At the conclusion of the evidence, the trial court, by instructions Nos. 14 and 15, submitted to the jury the following City ordinances:

Unauthorized connections prohibited. It is unlawful to connect to the electric current, any electrical installation, extension thereof or electrical equipment, until a lawful permit for such work has been obtained and the installation has been inspected and approved by the building official or his authorized agent.

In order to safeguard persons and property from the danger incident to unsafe or improperly installed electrical equipment, the building official shall immediately sever any unlawfully made connection of electrical equipment to the electrical current if he finds that such severing is essential to the maintenance of safey and the elimination of hazards.

Bellevue Municipal Code § 16.32.090 (Ordinance No. 163, § 9, June 12, 1956) ; and

Unsafe prior installations. The building official shall have the authority to inspect, any previously installed electrical equipment such as is regulated by this code, even though it may have been installed in accordance with former city regulations. Should he find such installation or equipment to be manifestly unsafe to life or property, he shall serve written notice to the owner and/or user thereof that such unsafe conditions exist and must be eliminated within a period of not to exceed sixty days. If such requirements are not complied with within the stated time, he shall disconnect or cause to be disconnected, the current from such installation or equipment. After the building official has disconnected such installation or equipment from the electric current, or caused the disconnection, it shall be unlawful for any person to reconnect such installation or equipment to the electric current without the approval of the building official.

Bellevue Municipal Code § 16.32.110 (Ordinance No. 163, § 11, June 12, 1956).

 These instructions were followed by instructions Nos. 17 and 18, which, respectively, informed the jury that a violation of such ordinances would constitute negligence as a matter of law and that an electrical inspector owed a duty to comply with such ordinances and with recognized standards of electrical practice, failing which would constitute negligence. No assignment of error has been directed to these instructions, hence they constitute the law of the case. *Brown v. Quick Mix Co.*, 75 Wn.2d 833, 454 P.2d 205 (1969). There is substantial evidence upon which the jury could have predicated a finding that the City's agents were negligent in failing to perform duties imposed by the ordinances and standards of electrical practice, which negligence in turn constituted a proximate cause of the unfortunate injury and death.

The theme of the City on this appeal, however, is that it is cloaked with immunity from liability when carrying out its responsibilities under its electrical code. Hence, the City contends the plaintiff's claim must fall as a matter of law.

In support of its theory of nonliability, the City first points to a provision of its electrical code reading as follows:

Limitation of city responsibility. This chapter shall not be construed to lessen the responsibility of any person owning, operating or installing any electrical wires, appliances, apparatus, construction or equipment, for damages to anyone injured by defect therein, nor shall the City of Bellevue, or any employee thereof, be held liable for any injury or damage resulting from the non-compliance of any electrical installation with the provisions of this code.

Bellevue Municipal Code § 16.32.120 (Ordinance No. 163, § 12, June 12, 1956).

■ We cannot agree with the City that ordinance No. 163 (§ 16.32.120) affords immunity under the circumstances of this case. The ordinance goes no further than to exempt the City from liability arising out of the bare existence of a noncomplying electrical installation. It does not purport to relieve the City of liability for tortious conduct of its agents in carrying out ordinance-mandated ministerial or operational duties[1] for which it might otherwise be liable by virtue of RCW 4.96.010.[2] The ordinance cannot be analogized to or with RCW 19.28.340,[3] which clothes the State and

[1]*Evangelical United Brethren Church v. State,* 67 Wn.2d 246, 407 P.2d 440 (1965).

[2]"All political subdivisions, municipal corporations, and quasi municipal corporations of the state, whether acting in a governmental or proprietary capacity, shall be liable for damages arising out of their tortious conduct, or the tortious conduct of their officers, agents or employees to the same extent as if they were a private person or corporation: *Provided,* That the filing within the time allowed by law of any claim required shall be a condition precedent to the maintaining of any action. The laws specifying the content for such claims shall be liberally construed so that substantial compliance therewith will be deemed satisfactory." RCW 4.96.010.

[3]"Nothing contained in this chapter will be construed to relieve from or lessen the responsibility or liability of any person for injury or damage to person or property caused by or resulting from any defect of any nature in any electrical work performed by said person or in any electrical equipment owned, controlled, installed, operated or used by him; nor shall the state of Washington, or any officer, agent, or

its officers and agents with a broader immunity for acts performed pursuant to the state electrical code.

The City next turns to *Nerbun v. State*, 8 Wn. App. 370, 506 P.2d 873 (1973), and *Loger v. Washington Timber Prods., Inc.*, 8 Wn. App. 921, 509 P.2d 1009 (1973), and asserts they stand for the proposition in this state that "there is no duty to inspect that can support a cause of action inspite [*sic*] of mandatory statutory language and knowledge of the condition." Both cases involved allegations that safety inspectors employed by the Department of Labor and Industries failed to inspect the accident site pursuant to and in accordance with RCW 49.16.120.[4] In *Nerbun*, the accident involved occurred on a construction site while the workmen involved were dismantling "false-work" at the direction of their job superintendent by a method which had been disapproved some 30 days earlier by the state safety inspector. In *Loger*, the plaintiff workman was injured in a sawmill by a defective and unsafe saw which was not guarded or hooded in accordance with state safety standards and which had not been inspected by state safety inspectors for more than a year. Resolution of each case in favor of the State turned on the conclusion of the Court of Appeals that it was not the legislative intent in enacting safety standards and authorizing spot inspec-

employee thereof incur or be held as assuming any liability by reason or in consequence of any permission, certificate of inspection, inspection or approval authorized herein, or issued or given as herein provided, or by reason of consequence of any things done or acts performed pursuant to any provision of this chapter." RCW 19.28.340.

[4]"It shall be the duty of the director of labor and industries, through and by means of the division of safety to enforce the safe place, safety device and educational standards and orders, to inspect the establishment or work of every employer engaged in extrahazardous work (other than coal mines) as often as it is deemed necessary, but not less than once every year, for the purpose of ascertaining whether the safe place, safety device and educational standards applicable thereto are being complied with and to investigate and analyze all serious accidents to workmen in order to provide a remedy to prevent a repetition of the same, not only in the establishment in which the accident occurred, but also in all other like establishments." RCW 49.16.120.

tions to impose liability upon the State for the failure of a safety inspector to perform the discretionary act of inspection. These cases, therefore, are clearly distinguishable from the instant situation where an inspection was in fact carried out, a highly dangerous condition was found to exist, and the ministerial or operational remedies dictated by the City's electrical code were not performed, *i.e.*, severing the electrical connection and/or disconnecting the service if the condition was not corrected within 60 days.

The City lastly vigorously contends that its enactment of electrical safety regulations and provisions for inspection and enforcement give rise only to a broad general responsibility to the public at large rather than to individual members of the public. Thus, the City asserts, a general failure to inspect or enforce its electrical code creates no liability as to plaintiff. In support of this contention, the City directs our attention to numerous authorities from other jurisdictions[5] as well as *Nerbun* and *Loger*. The City relies principally upon cases from the State of New York, from whence our statutes, RCW 4.92.090[6] and RCW 4.96.010, abrogating sovereign immunity were drawn. *Kelso v. Tacoma*, 63 Wn.2d 913, 390 P.2d 2 (1964).

We have no particular quarrel at this time with the general premise on which the cases relied upon by the City stand, *i.e.*, negligent performance of a governmental or discretionary police power duty enacted for the benefit of the

[5]Among those cases relied upon are: *Steitz v. Beacon*, 295 N.Y. 51, 64 N.E.2d 704, 163 A.L.R. 342 (1945); *Rivera v. Amsterdam*, 5 App. Div. 2d 637, 174 N.Y.S.2d 530 (1958); *Carroll v. New York*, 37 Misc. 2d 563, 234 N.Y.S.2d 954 (Sup. Ct. 1962); *Motyka v. Amsterdam*, 15 N.Y.2d 134, 204 N.E.2d 635, 256 N.Y.S.2d 595 (1965); *Messineo v. Amsterdam*, 17 N.Y.2d 523, 215 N.E.2d 163, 267 N.Y.S.2d 905 (1966); *Stranger v. New York Elec. & Gas Co.*, 25 App. Div. 2d 169, 268 N.Y.S.2d 214 (1966); *Modlin v. Miami Beach*, 201 So. 2d 70 (Fla. 1967); *Hoffert v. Owatonna Inn Towne Motel, Inc.*, 293 Minn. 220, 199 N.W.2d 158 (1972); *Duran v. Tucson*, 20 Ariz. App. 22, 509 P.2d 1059 (1973).

[6]"The state of Washington, whether acting in its governmental or proprietary capacity, shall be liable for damages arising out of its tortious conduct to the same extent as if it were a private person or corporation." RCW 4.92.090.

public at large imposes no liability on the part of a municipality running to individual members of the public. Nevertheless, we note that running either explicitly or implicitly through some of the leading cases cited by the City is the thread of an exception to the general rule they espouse, *i.e.*, where a relationship exists or has developed between an injured plaintiff and agents of the municipality creating a duty to perform a mandated act for the benefit of particular persons or class of persons, then tort liability may arise.

For example, in *Motyka v. Amsterdam,* 15 N.Y.2d 134, 139, 204 N.E.2d 635, 256 N.Y.S.2d 595 (1965), wherein it was contended a negligent fire department inspection under safety codes caused damage, the court in denying municipal liability observed in passing:

> In the case of municipalities, as of other defendants, tort liability has been held to exist where there has been some relationship on the part of the defendant to the plaintiff creating a duty to use due care for the benefit of particular persons or classes of persons . . . but we have never gone so far as to hold that a general liability exists to the public for civil damage in event of failure to supply adequate police or fire protection.

In *Stranger v. New York Elec. & Gas Co.,* 25 App. Div. 2d 169, 172, 268 N.Y.S.2d 214 (1966), again involving an allegedly faulty fire safety inspection, the court in determining that no liability arose therefrom on the part of the municipality noted, in commenting on the case of *H.R. Moch Co. v. Rensselaer Water Co.,* 247 N.Y. 160, 159 N.E. 896, 62 A.L.R. 1199 (1928):

> Assuming, nevertheless, that the rule [acting gratuitously] contended for might otherwise apply, it seems clear that the answer to the "query * * * whether the putative wrongdoer has advanced to such a point as to have launched a force or instrument of harm, or has stopped where inaction is at most a refusal to become an instrument for good" . . . is to be found in the second alternative. A legal relationship, albeit a neutral one, existed as between the municipality and the decedent and that relationship could not be personalized, and

changed to one of liability by reason of the city employees' performance of the routine governmental functions assigned to them. . . . Whether well or imperfectly performed, the city employees' acts were governmental acts undertaken pursuant to their employment and, even if it could be assumed, nevertheless that they were such as to evoke the rule of *Moch*, it is abundantly clear that they resulted in no new or added risk and gave rise to no new or different situation or obligation upon which plaintiff's intestate could or did rely, to her harm.

In distinguishing *Runkel v. New York*, 282 App. Div. 173, 123 N.Y.S.2d 485 (1953); *Runkel v. Homelsky*, 286 App. Div. 1101, 145 N.Y.S.2d 729, *aff'd*, 3 N.Y.2d 857, 145 N.E.2d 23, 166 N.Y.S.2d 307 (1957), which fixed municipal tort liability upon a statutorily mandated duty, the *Stranger* court stated:

Further, appellant's theory excludes any dependence on the breach of a mandatory statutory duty and in his brief he states that, "There was no duty upon the City to act, it acted anyway and did so negligently."

*Stranger v. New York Elec. & Gas Co., supra* at 173.

Again, in *Duran v. Tucson*, 20 Ariz. App. 22, 25, 509 P.2d 1059 (1973), the court noted in quoting from a Connecticut case:

". . . The failure of a public officer to perform a public duty can constitute an individual wrong only when some person can show that in the public duty was involved also a duty to himself as an individual, and that he has suffered a special and peculiar injury by reason of its nonperformance." [*Leger v. Kelley*, 110 A.2d 635, 636 (Conn. Super. Ct. 1954), *aff'd*, 142 Conn. 585, 116 A.2d 429 (1955).]

Somewhat illustrative of the exception to the general rule are the cases of *Smullen v. New York*, 28 N.Y.2d 66, 268 N.E.2d 763, 320 N.Y.S.2d 19 (1971), and *Runkel v. New York, supra*. In *Smullen*, a city sewer construction inspector failed to require shoring of a trench contrary to a safety rule requiring such. In finding the city liable, the court stated:

The city correctly asserts that there can be no municipal liability for failure to perform a general protective governmental function; that an inspector's failure to ascertain a violation cannot confer liability [citing cases]. The question here, however, goes beyond the basic failure to perceive a violation. Here a blatant violation existed; the categorical regulations did not permit the inspector to form a judgment but he nevertheless proceeded to do so and wrongly adjudged the trench to be safe and stood by while decedent, knowing of his presence and approval, entered into the perilous situation.

*Smullen v. New York, supra* at 70-71.

In *Runkel*, the city's building inspector, contrary to safety requirements, failed to abate a danger arising out of the existence of a dilapidated house. In finding municipal liability to injured minor trespassers, the court stated:

An abandoned open structure which is so rotted and dilapidated that it is in imminent danger of collapse may be said to constitute a trap or an "inherently dangerous" instrumentality which is in the same class as an explosive substance, inflammable material, a live electric wire or a spring gun. Injury sustained by any person, even though he be a trespasser, due to such an inherently dangerous instrumentality, may be said to have been caused by the wanton or intentional or inhuman act of the one responsible for its existence or its removal and will cast him in liability, provided: (a) that care "commensurate with the risk involved" has not been taken to guard against the injury; and (b) that the accident was "foreseeable"—as it was here because of the structure's proximity to the public highway.

*Runkel v. New York, supra* at 176.

The legislature of this state, in abrogating municipal immunity by way of RCW 4.96.010, painted with a broad brush. *Evangelical United Brethren Church v. State,* 67 Wn.2d 246, 407 P.2d 440 (1965). In *Evangelical* we held that negligent acts or omissions of state agents falling into the category of "operational" or "ministerial" functions—not involving executive or administrative discretion—to be performed pursuant to statutory direction gave rise to sovereign liability.

In the instant case, the City's electrical inspector was alerted to and knew of the nonconforming underwater lighting system and of the extreme danger created thereby to neighboring residents in proximity to the stream in question. Yet, the inspector failed to comply with the City's ordinances (Bellevue Municipal Code §§ 16.32.090 and .110) directing that he sever or disconnect the lighting system until it was brought into compliance with electrical code requirements. These requirements were not only designed for the protection of the general public but more particularly for the benefit of those persons or class of persons residing within the ambit of the danger involved, a category into which the plaintiff and his neighbors readily fall.

Accordingly, we find municipal liability.

The companion cause, No. 43053, arises out of a petition by plaintiff in Superior Court to require the City to post a supersedeas bond pending the appeal in the principal action. The trial court granted plaintiff's petition. The City sought review by way of certiorari. The Chief Justice stayed the trial court's order and set the matter over to the hearing on the merits of the principal case.

The City contends that no supersedeas bond is required of it to stay execution of judgment against it pending appeal. In support of this contention, the City points to RCW 4.92.080, which provides:

> No bond shall be required of the state of Washington for any purpose in any case in any of the courts of the state of Washington and the state of Washington shall be, on proper showing, entitled to any orders, injunctions and writs of whatever nature without bond notwithstanding the provisions of any existing statute requiring that bonds be furnished by private parties.

In *Hockley v. Hargitt*, 82 Wn.2d 337, 510 P.2d 1123 (1973), the question of the need for a county to post a bond in relation to seeking an injunction was presented. Concerning the effect of RCW 4.92.080, we said:

> The trial court correctly held that King County need not post a bond since RCW 4.92.080 exempts the state

from posting a bond in any action. The prosecutor was proceeding under a state statute. The county is but an arm of the state. *State ex rel. Spokane v. DeGraff*, 143 Wash. 326, 255 P. 371 (1927). A statute essentially comparable to RCW 4.92.080 was construed in *State ex rel. Thrash v. Lamb*, 237 Mo. 437, 141 S.W. 665 (1911), to excuse the county prosecutor from posting a bond when proceeding on behalf of the state. It would be an anomaly to free the state from posting a bond while imposing such requirement upon its political subdivision whose life and authority derive from the state.

*Hockley v. Hargitt, supra* at 347.

▮ Cities, like counties, as political subdivisions, constitute an arm of the state from whence their being and authority flow. *Lauterbach v. Centralia*, 49 Wn.2d 550, 304 P.2d 656 (1956). We see no rational reason for distinction, then, between the applicability of RCW 4.92.080 to cities as well as counties.

The trial court's order imposing a supersedeas bond requirement pending the City's appeal is accordingly vacated.

HALE, C.J., and FINLEY, ROSELLINI, HUNTER, UTTER, and BRACHTENBACH, JJ., concur.

WRIGHT, J. (dissenting)—I dissent. The appellant, City of Bellevue, is charged with negligence on the part of one of its employees for an alleged failure to make a proper electrical inspection. There is no common-law duty upon a city to perform inspections on private property. In the absence of either a statute or an ordinance providing for inspections, there not only would be no duty to make such an inspection, there would be absolutely no authority to make such an inspection. Any duty, therefore, must rest upon a statute or ordinance.

The statute relating to electrical inspections is RCW 19.28. By RCW 19.28.360 state inspection requirements specifically do not apply within certain cities and towns, that is, any city having an ordinance requiring an equal or higher standard of inspection. There is no contention that

Bellevue fails to fall within the exemption granted by RCW 19.28.360.

The position of electrical inspector in the city of Bellevue is created by the city ordinance, and his powers and duties are established by the ordinance. The installation in question herein was made before that area was within the city of Bellevue and, therefore, the only authority of the inspector would come from Bellevue Municipal Code 16.32.110 (ordinance No. 163 § 9) entitled "Unsafe prior installations." The authority of an inspector under that section is limited to the service of a written notice requiring correction of the unsafe condition within not more than 60 days. Only after failure to comply with the notice may the inspector disconnect. In the instant case, had he immediately disconnected the power from the outside wiring, he would have been a trespasser. How, I ask, may the City be liable because its employee did not do an act which, if done, would have been unlawful?

There is a further reason why the City cannot be liable in a situation such as this. The rule has long been in this state that a city will not be liable for failure to enforce its ordinances. A leading case in this jurisdiction is *Kitsap County Transp. Co. v. Seattle*, 75 Wash. 673, 135 P. 476 (1913). Therein the city had an ordinance forbidding the dumping of refuse into the waters of Elliott Bay. Plaintiff's steamship was damaged by contact with certain timbers and piles unlawfully placed in the water.

The court stated the problem as follows at page 674:

The sole question here for determination is whether or not the city, in exercising control over the harbor and waters of Elliott Bay in front of the city of Seattle, is liable in damages for failure of the port warden to enforce an ordinance which provided for the keeping of the harbor free from debris.

Further, the court said at pages 677-78:

The general rule is that a city is not civilly liable for neglect of duty on the part of its officers in respect to the

enforcement of ordinances. In 4 Dillon, Municipal Corporations (5th ed.), § 1627, it is said:

"Unless there be a valid contract creating, or a statute declaring, the liability, a municipal corporation *is not bound to secure a perfect execution of its bylaws,* relating to its public powers, and it is not responsible civilly for neglect of duty on the part of its officers in respect to their enforcement, although such neglect results in injuries to private persons which would otherwise not have happened."

Numerous other cases to the same effect include *Wegmiller v. State,* 154 Wash. 101, 280 P. 739 (1929); *Fluckiger v. Seattle,* 103 Wash. 330, 174 P. 456 (1918), and *Goggin v. Seattle,* 48 Wn.2d 894, 297 P.2d 602 (1956).

Two recent cases to the same effect, both of which cases involve safety inspections, are *Nerbun v. State,* 8 Wn. App. 370, 506 P.2d 873 (1973) and *Loger v. Washington Timber Prods., Inc.,* 8 Wn. App. 921, 509 P.2d 1009 (1973).

For the reasons stated, I believe this action should be dismissed as against the defendant City of Bellevue, and, therefore, I would reverse.

STAFFORD, J. (concurring specially in the dissent)—I concur with that portion of the dissent which questions the advisability of holding a city liable for inaction of its employees under the facts herein.

Under the attendant circumstances disconnection of the offending electrical system, without the required notice, would have amounted to a trespass by the city employees. How such can rise to the dignity of a duty to act, on the part of a city, is difficult to accept.