[No. 3988–II.   Division Two.   November 20, 1980.]

HARRY S. RUDDACH, ET AL, *Respondents,* v. DON
JOHNSTON FORD, INC., ET AL, *Appellants.*

*Paul L. Stritmatter,* for appellants.

*James M. Stewart,* for respondents.

REED, C.J.—This case arose from a disagreement over who was to pay for damage to a leased building. The principal item in dispute is the cost of a new heating system and incidentally the cost of various lighting fixtures and electrical switches either missing or nonfunctional when the lease terminated.

The leased premises consist of a downtown Aberdeen building constructed in 1948 to house a new car sales and service business. At the time of trial plaintiffs were the owners of both the building and the lessor's interest in a lease to defendant Don Johnston Ford, Inc., the term of which ended December 31, 1977. Defendant Bi–Rite, Inc., had subleased the premises from Johnston. For ease of identification both Don Johnston Ford, Inc., and Bi–Rite, Inc., will hereafter be referred to as "tenants" and plaintiffs as "landlords."

In 1977 with the lease about to expire, the landlords decided to sell the building and reached an agreement with Huffman Motors, Inc., for its purchase, with possession to be delivered at the end of the lease term. As Huffman was preparing to occupy the premises it discovered that many of the lighting fixtures were missing and the heating system did not work because of damage to the boiler. Landlords and Huffman then executed a supplemental agreement under which the parties would share the cost of repair with landlords' liability not to exceed $5,000. Additionally, landlords reserved the right to bring suit against the tenants for the cost of such repairs, applying net proceeds to its obligation under the supplemental agreement.

After trial the Superior Court awarded landlords a judgment for damages to the boiler in the amount of $9,450, plus $2,355 for repainting the building and $1,064.54 for replacing broken glass. The court rejected landlords' claim for $1,774.19 in damages to the lighting system. Tenants appealed. The landlords have cross–appealed contending that the damages awarded do not fully compensate for the loss of the boiler and that the refusal to award damages for the lighting system was erroneous. Those portions of the

judgment relating to the cost of replacing broken glass and repainting the building are not disputed in this appeal.

The tenants advance three major contentions in support of their argument that the judgment for damage to the boiler must be reversed or reduced in amount. The tenants first argue that the boiler failed as a result of "ordinary wear and tear" instead of as a result of sudden catastrophic damage. The lease provides that the tenants are not liable for ordinary wear and tear.[1]

The trial court found that with proper maintenance the 29–year–old boiler had a useful life of 40 years. It also found the boiler was damaged when it was "dry fired" by the tenants—that is, when it was operated without any water in the boiler. The trial court then concluded that "dry firing" did not amount to ordinary wear and tear. Accordingly, it found the tenants liable for the damage. We affirm the trial court based upon *Publishers Bldg. Co. v. Miller*, 25 Wn.2d 927, 172 P.2d 489 (1946), in which the court stated at pages 939–40:

> The appellant makes a further contention in her brief to the effect that the damage to the boiler was due to "reasonable wear," or at least that the question was one for the jury. In our opinion, the contention is untenable.
>
> The expressions "reasonable wear," "ordinary wear and tear" and similar phrases apply more naturally to the gradual deterioration resulting from use, lapse of time, and to a certain extent to the operation of the elements, but do not cover destruction, in whole or in part, of a structure by some sudden catastrophe. The occurrence here did not present a spectacle resulting from ordinary or reasonable wear; it evidenced a sudden casualty, more in the nature of a catastrophe. The crack in

---

[1]The pertinent provisions from the lease read as follows: "[L]essee shall keep the buildings on said premises in good repair and to maintain said premises at all times during the terms hereof . . .

" . . .

"Lessee agrees to quit and surrender said premises to the lessor at the end of the term of this lease or any extension thereof in as good condition as the same now are, reasonable use, wear and tear excepted."

the boiler occurred by reason of the boiler being subjected to extreme heat at a time when there was insufficient water within it. The result was a sudden occurrence, not a gradual deterioration.

Having determined that the tenants are liable for loss of the boiler, the next issue is the amount of that damage. The tenants contend that they should be required to pay only the depreciated cost of the 29–year–old boiler. However, the tenants do not point to any evidence in the record of such a cost. Moreover, the tenants overlook the long–established rule for computation of damages in cases such as this. The proper measure of damages is the cost of restoration of the building to its former condition unless the cost of restoration exceeds the diminution in value of the building caused by the failure to maintain the building as the lease required. *James S. Black Co. v. F.W. Woolworth Co.*, 14 Wn. App. 602, 544 P.2d 112 (1975); *see also Falcone v. Perry*, 68 Wn.2d 909, 416 P.2d 690 (1966); *DeLano v. Tennent*, 138 Wash. 39, 244 P. 273, 45 A.L.R. 766 (1926). There is no evidence that repairs could have been made for less than the cost of replacing the heating plant. Thus, had there been no basis for comparison of a diminution in value with the actual cost of a new heating system, the trial court would have been correct in holding that the measure of damages was the actual cost of the new system. As we shall demonstrate, however, the supplemental agreement executed by landlords and Huffman was proof of a diminution in value that was exceeded by the cost of restoring the building to its former condition by means of a new heating plant.

Tenants' final contention in this regard is that damages should be limited to $5,000 because of the supplemental agreement between landlords and Huffman, the building's purchaser. As noted, this agreement requires landlords to contribute up to $5,000 and no more of the cost of repair or

replacement of the damaged parts of the building, including the heating system.[2]

Tenants' principal argument is that failure to restrict the landlords' recovery to $5,000 results in landlords receiving a windfall gain, citing *349 W. Ontario Bldg. Corp. v. Palmer Truck Leasing Co.,* 22 Ill. App. 3d 467, 317 N.E.2d 740 (1974), and *Bowes v. Saks & Co.,* 397 F.2d 113 (7th Cir. 1968).

A lessee who breaches a provision of the lease requiring him to make certain repairs or to deliver up the premises at the termination of the lease in a certain condition is liable in damages for the reasonable cost of making such repairs or of putting the premises in the condition prescribed by the lease.

*Crystal Concrete Corp. v. Braintree,* 309 Mass. 463, 470, 35 N.E.2d 672, 675 (1941).

Cost of repairs is merely a convenient way to quantify the damage a lessor has suffered. Where the facts indicate that cost of repairs is unrelated to lessors' actual damage, the rule is not applied. Pennsylvania Cement Co. v. Bradley Contracting Co., 11 F.2d 687, 688 (2d Cir. 1926) (L. Hand, J.).

---

[2]That the parties so understood is manifest from the testimony of both Ruddach and Huffman:

"Q [To Mr. Ruddach] Under the terms of this agreement do I understand it that you are required to reimburse Huffman for some repairs?

"A Partially.

"Q And the limit of your responsibility—the maximum that you have to pay them is $5000? Doesn't it say that " . . . provided that in no event shall the Seller be responsible for an amount in excess of $5000 . . .?"

"A That's what it says.

"Q And you are the Seller?

"A That's right.

"Q And that's the limit of your responsibility or liability for any repairs?

"A It says so here, yes.

"Q And is that your understanding, Mr. Ruddach?

"A Yes.

" . . .

"Q [To Mr. Huffman] And under the terms of that agreement, Mr. Ruddach was to reimburse you up to $5000 for some of these items?

"A Yes."

"In an action for breach of contract, as opposed to a suit sounding in specific performance, the lessor is entitled only to the damages that were caused to the property by the failure to restore. Where the expense of restoration exceeds the diminution in the market value of the property caused by the lessee's nonperformance, the diminution in fair market value is the proper measure of damages." Dodge Street Building Corp. v. United States, 341 F.2d 641, 644, 169 Ct.Cl. 496 (1965). If the "cost of repair" rule will give lessors a greater benefit from the breach than could be gained from full performance, a different measure of damages must be applied to avoid injustice. Peevyhouse v. Garland Coal & Mining Co., 382 P.2d 109, 113 (Okla.1963). Accord, Giordano v. Brandywine Mushroom Corp., 32 Pa.Dist. & Co. R.2d 522, 525–26 (1963). And see Realty Associates v. United States, 138 F. Supp. 875, 134 Ct.Cl. 167 (1956).

*Bowes v. Saks & Co., supra* at 116–17.

On the particular facts of this case, tenants are correct. The record shows that approximately 1 year prior to the expiration of the lease, landlords decided to sell the building, placing upon it a value of $355,000. Shortly after the lease expired, landlords put the property on the market and received their asking price from Huffman without reduction.[3] Had the matter rested there, the landlords

---

[3]On cross–examination plaintiff Harry Ruddach testified as follows:

"Q Mr. Ruddach, you, as I understand it, made a determination yourself of what you felt property was selling for and made a determination of how much you wanted for the sale of your property about a year before the end of the lease, is that right?

"A That's right.

"Q And you determined what you felt was a full, fair market value for the property?

"A At that time.

"Q And when you did that you had not been in the property for five years, had you?

"A Approximately.

"Q All right. And you determined that the property was worth $355,000?

"A That's right.

"Q And you offered to sell it for that and that's exactly what you got, isn't it?

"A That's right.

"Q There was no negotiation and no reduction of your value at all?

"A That's right.

would have failed to demonstrate there had been any diminution in value because of tenants' derelictions. Under the rule which places a ceiling on damages recoverable by a landlord for breach of a tenant's agreement to repair at the diminution of value of the premises, *Falcone v. Perry, supra. See also Missouri Baptist Hosp. v. United States,* 555 F.2d 290 (Ct. Cl. 1977); *Dodge St. Bldg. Corp. v. United States,* 341 F.2d 641, 644 (Ct. Cl. 1965), landlords would receive a windfall if awarded the cost of repairs. However, after becoming apprised of the full extent of the damage, Huffman secured landlords' supplemental promise. This amounted to a reduction in market price and, by definition, a diminution in value. Although the supplemental agreement does not describe it in those terms—calling it an agreement to share the expense of repairs—the net effect of these negotiations was to lower the price by the extent to which landlords had to contribute repair costs, up to $5,000. We know now that the total cost of repair exceeded $10,000. Consequently landlords' actual loss is $5,000 and that must be the limit of their recovery. *Pennsylvania Cement Co. v. Bradley Contracting Co.,* 11 F.2d 687 (2d Cir. 1926). Accordingly, the judgment is affirmed but reduced to the total sum of $5,000 plus costs.

PETRIE, J., concurs.

PETRICH, J. (dissenting)—I dissent from that portion of the majority decision which would limit the plaintiff landlords' recovery to the amount of $5,000. The majority's basis for such a limitation is its interpretation and application of the supplemental agreement between the landlords

---

"Q Or reduction of your price, I should say.
"A The property in the next block sold for $150,000 with no buildings on it, so I came to that conclusion that it was worth that much.
"Q You made a determination of how m⸗ square feet you had and what it should go for and you got the full valu ?
"A That's right. It's worth twice that toda ."

and Huffman, the building's purchaser.[4] However, a careful review of the record fails to disclose that the defendant raised this issue to the trial court. There are no trial briefs,

---

[4]The Supplemental Agreement stated:

"Comes now HARRY S. RUDDACH and HUFFMAN MOTORS, INC., and recite as follows:

"WHEREAS, an Earnest Money Agreement was entered into between the parties on November 28, 1976; and

"WHEREAS, the purchasers went through the premises prior to making the earnest money payment and added the words (including hoist and compressor) which items seller agrees should remain on the premises; and

"WHEREAS, the parties knew the conditions of the premises on November 28, 1976; and

"WHEREAS, there may be a dispute as to performance of the lease by the lessee and that it is indicated lessee may attempt to remove fixtures that should properly be part of the Real Estate; and

"WHEREAS, purchasers are intending to grant permission to the lessees to continue in possession two months after January 1st, 1978; and

"WHEREAS, the seller and purchaser do not presently know to what extent lessees may remove or attempt to remove such fixtures; and

"WHEREAS, purchaser does not desire to be involved in a suit against lessee or incur expenses of such action,

"IT IS MUTUALLY AGREED as follows:

"1. That the Contract will be signed and down payment will be promptly paid and effective as of January 1st, 1978, purchasers will be considered in possession.

"2. Seller retains the right to enforce the terms of the lease effective January 1st, 1968 and extended December 30, 1971 with termination date of December 31st, 1977 against the lessor.

"3. Seller will take legal steps necessary to restrain the removal of the hoist and compressor, if lessee attempts to remove the same.

"4. That it is agreed that the following will be repaired by Purchaser at the most reasonable cost and an itemized list of materials and repairs will be furnished Seller of the following items:

"(a) Boiler and heating system to be made operable.

"(b) Overhead doors to be repaired into a safe and operable condition.

"(c) Ceiling tile to be repaired in damaged area in show room above Jefferson Street entrance door.

"(d) Repair light fixtures that are inoperable inside (excluding lights, tubes and bulbs which are at Purchaser's account) and outside.

"(e) Cleaning up and placing exhaust system in operable condition.

"(f) Repair damage to fence next to alley.

"(g) Eight hoists will be made operable.

"When these repairs are completed and an itemized accounting furnished, Seller and Purchaser will share costs 50–50; provided that in no event shall the Seller be responsible for an amount in excess of $5,000.00 for his share.

"(5) Seller will enforce the terms of the lease against lessee including the seven items set out above. That from the proceeds of any judgment received the costs,

findings (adopted or proposed), or record of oral arguments suggesting that the agreement would somehow limit the defendants' liability. Although the agreement was introduced in evidence, so far as the record on appeal is concerned the question of whether it established "diminution in value" or some other limitation on the defendants' liability for damages was never presented to the trial court. Issues not raised before the trial court will not be considered for the first time on appeal. *Barnes v. Seattle School Dist. 1,* 88 Wn.2d 483, 563 P.2d 199 (1977); *Fuqua v. Fuqua,* 88 Wn.2d 100, 558 P.2d 801 (1977); *Brown v. Safeway Stores, Inc.,* 94 Wn.2d 359, 617 P.2d 704 (1980).

The facts as resolved by the trial court also preclude this court from applying the supplemental agreement as a limitation on the damages suffered by the plaintiff. The record is devoid of any findings proposed by the defendant that the agreement was entered into. The defendant totally ignored RAP 10.3(g), which requires a separate assignment of error for each challenged finding of fact, as well as for each finding refused by the trial court. Where no errors have been assigned, the trial court's findings become verities on appeal. *E.g., Ebenezer A.M.E. Zion Church v. Corporate Loan & Sec. Co.,* 72 Wn.2d 128, 432 P.2d 291 (1967); *Nerbun v. State,* 8 Wn. App. 370, 506 P.2d 873 (1973). Since the agreement is not properly before us on review, it should not be applied to limit the plaintiff's recovery.

I am well aware of the policy of the court to avoid hypertechnical application of the rules in furtherance of justice. I believe, however, that the majority may well have misinterpreted the effect of the supplemental agreement. The majority focuses its attention on one aspect of the agreement, namely the limitation of the plaintiff's liability to Huffman. It ignores what appears to be the plaintiff's

---

including attorney's fees and the monies expended as above determined on a 50–50 basis, shall first be deducted.

"DATED this ___20___ day of January, 1980.

[Signatures omitted.]"

responsibility to pursue the owner's remedies under the lease and to apply the proceeds of the judgment to specified repairs which, as it turned out, were substantially the same repairs the tenant was obligated to perform under the lease. By reducing the judgment to $5,000, the majority has exposed the plaintiff to additional liability under the agreement. From the reduced judgment of $5,000 is first deducted attorney's fees and costs of suit. The balance is then apportioned to the cost of repairs. Assuming costs and attorney's fees in the modest sum of $3,000, the plaintiff is entitled only to a credit of $1,000 on his agreed contribution and is required to pay an additional sum of $4,000. The majority may or may not agree with this interpretation. At best, the agreement is ambiguous. The trial court is the appropriate forum to resolve the ambiguity. This was not done. The trial court having been deprived of the opportunity to consider this issue, this court should not inject it into the case.

The majority's concern of a "windfall" to the plaintiff is misplaced. In my view, the majority, by its opinion, grants a "windfall" to the "wrongdoer," the tenant who breached the lease agreement. I would deny the defendant the use of the supplemental agreement as a shield on the rationale of the "collateral source" doctrine.

I would further point out that Huffman, to the extent that it contributes to the repairs occasioned by the defendants' breach of the lease agreement, is subrogated to the plaintiff's rights to enforce the agreement. Double recovery is thus eliminated. Although subrogation rights are most generally applied in tort actions, the principle equally applies to contract rights. *Consolidated Freightways, Inc. v. Moore,* 38 Wn.2d 427, 430–31, 229 P.2d 882 (1951):

> It is a well settled rule in tort actions that a party has a cause of action notwithstanding the payment of his loss by an insurance company. The purpose of this rule is to implement the insurance company's right of subrogation, and not to afford the respondent a double recovery.

"It [subrogation] is a device adopted by equity to compel the ultimate discharge of an obligation by him who in good conscience ought to pay it." 50 Am. Jur. 678.

That insurance company recoveries, under their right of subrogation, most often flow from tort actions is quite natural, but without significance. Subrogation is an equitable principle and applies to contract rights as fully as it does to tort actions.

By his contract the appellant bound himself to pay the loss. Respondent has a contractual right to recover it from him. This cause of action is not defeated by the insurance company's payment of the judgment. The insurer is subrogated to respondent's contract right of indemnity. This sustains the cause of action against appellant for the identical reason that subrogation sustains a tort action where the plaintiff has been paid for his loss.

(Citations omitted.)

For the reasons stated, I believe the trial court's judgment should be affirmed in toto.

Reconsideration denied December 26, 1980.

Review granted by Supreme Court April 17, 1981.