[No. 47532-6.   En Banc.   May 6, 1982.]

HARRY S. RUDDACH, ET AL, *Petitioners*, v. DON
JOHNSTON FORD, INC., ET AL, *Respondents*.

*James M. Stewart* and *Stewart & Thomas, Inc., P.S.,* for petitioners.

*Paul L. Stritmatter* and *Stritmatter & Stritmatter,* for respondents.

DORE, J.—Prior owner and landlord Ruddach brought suit against tenants Don Johnston Ford, Inc., upon a 10–year lease. Such lease provided, among other things:

lessee shall keep the buildings on said premises in good repair and to maintain said premises at all times during the terms hereof . . .

and

Lessee agrees to quit and surrender said premises to the lessor at the end of the term of this lease or any extension thereof in as good condition as the same now are, reasonable use, wear and tear excepted.

In Superior Court, the principal items in dispute were the costs of a new heating system and of various lighting fixtures and electrical switches which were either missing or nonfunctional when the lease terminated. The trial judge awarded the landlord a judgment for damages in the amount of $12,869. The Court of Appeals affirmed the findings and conclusions of the trial court but reduced the damage award to $5,000, holding that under a written supplemental agreement between Ruddach and the new buyer, his exposure for repairs was only $5,000. The appellate court reasoned that if the former owner received more than $5,000 it would be receiving a windfall for the difference between $12,869 and $5,000. Ruddach appeals the Court of Appeals judgment reduction.

The leased premises consisted of a downtown Aberdeen building constructed in 1948 to house a car sales and service business. At the time of trial, plaintiffs were the owners of both the building and the lessor's interest in a lease to defendant Don Johnston Ford, Inc., the term of which ended December 31, 1977. Defendant Bi–Rite, Inc., had subleased the premises from Johnston. For clarification, both Don Johnston Ford, Inc., and Bi–Rite, Inc., are "tenants", and Ruddach is both "landlord" and "seller".

In 1977, with the lease about to expire, the landlord decided to sell the building and reached an agreement with

Huffman Motors, Inc., for its purchase, with possession to begin at the end of the lease term. Buyer Huffman was preparing to occupy the premises when he discovered that many of the lighting fixtures were missing and the heating system was inoperable because of damage to the boiler. At that time, Huffman also learned that the tenants were intending to remove some of the improvements and fixtures that he understood were included in the purchase of the property. Huffman had added to the earnest money agreement the words "including hoist and compressor," which items seller agreed should remain on the premises. The tenants, however, claimed such items under the terms of their lease and made tentative plans to remove them.

With the real estate deal for the sale of the building and business deteriorating, the seller decided to make some concessions to purchaser Huffman in order to save the sale, and entered into a supplemental agreement designated "Ruddach–Huffman Real Estate Sale". The supplemental agreement was not between the landlord and tenants, but rather between the landlord/seller and the new purchaser, Huffman Motors, Inc.

The supplemental agreement, in part, alluded to the concerns of the purchaser as to whether he would get delivery on what he bought, by reciting that:

WHEREAS, there may be a dispute as to performance of the lease by the lessee and that it is indicated lessee may attempt to remove fixtures that should properly be part of the Real Estate; and

WHEREAS, purchasers are intending to grant permission to the lessees to continue in possession two months after January 1st, 1978; and

WHEREAS, the seller and purchaser do not presently know to what extent lessees may remove or attempt to remove such fixtures; and

WHEREAS, purchaser does not desire to be involved in a suit against lessee or incur expenses of such action.

In the supplemental agreement, the seller undertook obligations to the purchaser, as set forth in pertinent part as follows:

IT IS MUTUALLY AGREED as follows:

1. That the Contract will be signed and down payment will be promptly paid and effective as of January 1st, 1978, purchasers will be considered in possession.

2. Seller retains the right to enforce the terms of the lease effective January 1st, 1968 and extended December 30, 1971 with termination date of December 31st, 1977 against the lessor.

3. Seller will take legal steps necessary to restrain the removal of the hoist and compressor, if lessee attempts to remove the same.

4. That it is agreed that the following will be repaired by Purchaser at the most reasonable cost and an itemized list of materials and repairs will be furnished Seller of the following items:

(a) Boiler and heating system to be made operable.
(b) Overhead doors to be repaired into a safe and operable condition.
(c) Ceiling tile to be repaired in damaged area in show room above Jefferson Street entrance door.
(d) Repair light fixtures that are inoperable inside (excluding lights, tubes and bulbs which are at Purchaser's account) and outside.
(e) Cleaning up and placing exhaust system in operable condition.
(f) Repair damage to fence next to alley.
(g) Eight hoists will be made operable.

When these repairs are completed and an itemized accounting furnished, Seller and Purchaser will share costs 50–50; provided that in no event shall the Seller be responsible for an amount in excess of $5,000.00 for his share.

5. Seller will enforce the terms of the lease against lessee including the seven items set out above. That from the proceeds of any judgment received the costs, including attorney's fees and the monies expended as above determined on a 50–50 basis, shall first be deducted.

Subsequently, pursuant to such supplemental agreement, the seller successfully initiated action in the Superior Court for Grays Harbor County to collect damages under the

terms of the lease against the tenants. Judgment was entered in the amount of $12,869, as previously related. Based on this record, we agree with the Court of Appeals that the trial court correctly found that the tenants had damaged the leased premises in the amount of $12,869. We next must determine whether it also properly reduced such judgment to $5,000.

We turn first to the issue of whether the Court of Appeals erred in considering the supplemental agreement as a limitation on liability when it was not mentioned in the findings of the lower court.

Issues not raised in the trial court will not be considered for the first time on appeal. *Brown v. Safeway Stores, Inc.*, 94 Wn.2d 359, 617 P.2d 704 (1980); *Barnes v. Seattle Sch. Dist. 1*, 88 Wn.2d 483, 563 P.2d 199 (1977); *Fuqua v. Fuqua*, 88 Wn.2d 100, 558 P.2d 801 (1977).

RAP 10.3(g) requires:

> A separate assignment of error for each instruction which a party contends was improperly given or refused must be included with reference to each instruction or proposed instruction by number. A separate assignment of error for each finding of fact a party contends was improperly made or refused must be included with reference to the finding or proposed finding by number. The appellate court will only review a claimed error which is included in an assignment of error *or clearly disclosed in the associated issue pertaining thereto.*

(Italics ours.)

A review of the record, briefs and memoranda indicates that the impact of the supplemental agreement on damages was thoroughly discussed at trial. Attorneys for Don Johnston Ford, Inc., requested the trial judge to include the factual basis and legal conclusion regarding the impact of the supplemental agreement in his findings.[1] We hold that the

---

[1] Page 55 of the Report of Proceedings states:

"MR. STRITMATTER: Okay. The only other thing is we feel that there should be included in the findings and conclusions the Court's factual basis, if necessary, and the Court's legal conclusion that Exhibit 4 does not limit the damages to $5000, because we think that's an important conclusion that the Court has made

Court of Appeals properly considered this issue on appeal.

The supplemental agreement was executed on January 20, 1978, 19 days after the consummation of the sale on January 1, 1978, when the asset which was the subject of the sale would pass to the new purchaser. On January 1, 1978, Huffman became the new owner of the building and business, including all leases for the space in such building. A reading of the supplemental agreement indicates that the new purchaser professed a disdain for buying a building and then being required to sue a former tenant to get what he thought he bought in the first place. To remove the burden from the new purchaser and to save the sale, Ruddach agreed to sue on behalf of the new purchaser. In the event he was unsuccessful, he would pay an additional $5,000 of his own funds to the new purchaser to make various repairs, including the boiler. The language of the supplemental agreement specifies that the seller had the obligation to file the suit, but all benefits received from such action would accrue to Huffman as the new owner of the property, subject to paragraph 5 of the supplemental

---

and that we think is important to the determination by the Court and is properly in the findings and conclusion of the Court.

"THE COURT: That's a negative conclusion, and I don't think I am called upon to make negative findings and conclusions.

"MR. STRITMATTER: All right. Well, I think the record has been made to the effect—

"THE COURT: I mean I would have certainly no objection to making a finding that that agreement, for whatever it's worth, was in fact entered into, but I don't think it's necessary to make any negative conclusions from it.

"MR. STRITMATTER: All right.

"THE COURT: If that made any difference, but I don't think you're going to have a problem if you appeal as far as getting that question before the court. Do you?

"MR. STRITMATTER: I hope not, Judge. I had one case a few years ago where I got knocked down on a procedural thing like this and I have been very nervous ever since whenever I am preparing a record for potential appeal. I think the Court has made its feelings known right now and its decision known, and that should show the Court of Appeals what the trial court has done. Thank you very much."

This discussion alone shows that the issue of the impact of the supplemental agreement was considered by both parties and the judge at trial.

agreement.

Paragraph 5 outlines the manner in which Ruddach must disburse the $12,869 received in damages from the tenants. After the deduction of costs and attorney's fees, Ruddach and Huffman would be on a 50–50 basis for any funds spent in making the repairs listed in detail in the supplemental agreement. Funds remaining after such reimbursement must go to Huffman, not to Ruddach.

The Court of Appeals said, "landlords would receive a windfall if awarded the cost of repairs". *Ruddach v. Don Johnston Ford, Inc.*, 27 Wn. App. 654, 660, 621 P.2d 742 (1980). This is untrue. Ruddach would receive none of the funds other than reimbursement for his own money spent in the event it was necessary to advance attorney's fees or the expenses for making any of the repairs listed in the supplemental agreement. Huffman is entitled to receive the proceeds of the lawsuit bargained for as the subject of the purchase. Huffman Motors, Inc., is receiving nothing more than that provided for in the terms of its buy–and–sell agreement with Ruddach. Had the tenant complied with the terms of the lease, the $12,869 would have been used to restore the premises to the original condition at the time of the commencement of the original lease.

Judge Petrich of the Court of Appeals, in his dissent, stated at page 663: "The majority's concern of a 'windfall' to the plaintiff is misplaced. In my view, the majority, by its opinion, grants a 'windfall' to the 'wrongdoer,' the tenant who breached the lease agreement." We agree.

Under this analysis, we do not find it necessary to extend the collateral source rule to the contract area to resolve this matter.

We reverse the Court of Appeals and reinstate the trial court judgment.

BRACHTENBACH, C.J., ROSELLINI, UTTER, DOLLIVER, WILLIAMS, and DIMMICK, JJ., and BEVER, J. Pro Tem., concur.