FILED
COURT OF APPEALS
DIVISION II

2013 NOV -5 AM 8:58

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

GARY SMITH,

        Appellant/Cross-Respondent,

v.

CLARK PUBLIC UTILITIES, a municipal
corporation of the State of Washington;

        Respondent/Cross-Appellant,

and

CLARK COUNTY by and through the
DEPARTMENT OF PUBLIC WORKS, a
political subdivision of the State of Washington,

        Respondent.

No. 41811-8-II
consolidated with
No. 42231-0-II

UNPUBLISHED OPINION

LEE, J. PRO TEM[1] — Gary Smith contacted a high-voltage power line and suffered personal injuries while riding atop a house being transported down State Route 500 in Camas, Washington. Smith sued the Clark County Department of Public Works (County) for negligently approving the move permits and Clark Public Utilities (CPU) for negligently reviewing the proposed route for utility hazards.

The trial court granted the County's summary judgment motion, holding that the public duty doctrine barred Smith's suit against the County; but it denied CPU's summary judgment

---

[1] Judge Linda Lee is serving as judge pro tempore of the Court of Appeals, Division II, under CAR 21(c).

motion, concluding that the public duty doctrine did not apply because CPU acted in a proprietary capacity when it reviewed the move.

Smith appeals the trial court's order granting summary judgment dismissing the County, arguing that (1) the public duty doctrine should be abolished and, (2) even if the public duty doctrine applies, the failure to enforce exception results in liability. CPU joins Smith's failure to enforce exception arguments regarding the County's liability, but not his claim that the public duty doctrine should be abolished.

CPU also appeals the trial court's denial of its summary judgment motion, arguing that (1) it did not owe a duty to Smith under the public duty doctrine; (2) regardless of the applicability of the public duty doctrine, CPU owed no duty to Smith because his employer had sole responsibility to ensure Smith's safety; and, (3) even if CPU owed a duty to Smith, CPU did not breach that duty as a matter of law.

We affirm the trial court's order granting summary judgment dismissing the County because Clark County Codes (CCC) 10.06A.020, 10.06A.030, and 10.06A.070(c)(11) do not create a mandatory and specific duty and the County has discretion over permit approval. Thus, the failure to enforce exception does not apply.

We also affirm the trial court's order denying CPU's summary judgment motion because CPU performed a proprietary function when reviewing the proposed move route. Thus, the public duty doctrine does not bar Smith's suit against CPU.

FACTS

Smith's employer, Northwest Structural Moving (NSM), contracted to move two houses, one on April 3 and one on April 10, 2005. During the April 10 move, Smith and another NSM employee were positioned on the roof to move any low-hanging, non-hazardous wires over the

2

peak of the roof. Smith contacted a high-voltage power line while riding atop the house on State Route 500 in Camas, Washington, and suffered severe personal injuries. Smith's injuries occurred while he was walking along the roof holding a telephone cable and a high-voltage wire contacted his back or neck.

NSM had conducted the April 3 move without incident. The structures moved on April 3 and on April 10 were the same height and were transported from the same location along the same route. The same employees rode atop the house on April 3 and lifted approximately 20 to 25 non-hazardous utility lines over the structure. The only difference between the two moves was Smith's position. On April 3, Smith stayed low on the roof's eaves throughout the move; whereas on April 10, he went to the roof's peak and stood up. NSM trained its employees to position themselves as low as possible on top of the structure and not to stand on the roof peak while the structure was moving.

In February 2005, Christy Settle, vice president of NSM, asked Robert Hinkel, a CPU associate design engineer, to remove a number of "guy stubs"[2] that made the roadway too narrow to accommodate the houses' width on a portion of the proposed route for the April 3 and April 10 moves. She also submitted a partial proposed route map showing where the guy stubs needed to be removed. In a fax to Hinkel, Settle stated that "[w]e also measured the entire route for utility wire moves and both houses are below any utility wires so this will not be an issue for us." Clerk's Papers (CP) at 825.

Although CPU lacked written guidelines for processing house moves, it was CPU's common practice to inspect the proposed route to determine whether there were any conflicts

---

[2] A "guy stub" is part of the apparatus used to anchor a utility pole to maintain its upright position. Clerk's Papers at 850.

with CPU facilities based on the contractor's measurements. Before reviewing a proposed route, CPU generally required the mover to provide the move route, the date and time of the move, the height and width of the structure to be moved, and any utility facilities that needed to be relocated. CPU reviewed proposed routes to prevent contractor injury, to ensure general public safety, and to prevent damage to its facilities because "we may have outages and we have responsibility for customer reliability." CP at 830.

Hinkel informed Settle that he would need a complete proposed route map, but Settle responded that she had driven the route and made the necessary measurements. Thus, she did not provide CPU with a map. Settle also stated that the houses' heights when loaded for transport were 17 feet, 2 inches.

Hinkel was concerned about the houses' height because, although the required clearance for utility lines was 18 feet, the height of electrical wires can fluctuate by a few inches depending on weather conditions. Thus, Hinkel informed Settle that CPU wanted to supervise the move for safety purposes and to prevent damage to CPU's facilities. Settle responded that she had driven the route and that there were no conflicts with CPU's facilities, so they did not need CPU's supervision for the move. She stated that NSM employees were "professionals" and did not need CPU's assistance. CP at 830. CPU did not supervise either move.

In March 2005, using the partial map NSM provided, Hinkel drove the proposed route, looking for possible clearance issues. Generally, when reviewing a route over which a structure would be moved, Hinkel would measure any lines that looked like they might be too low in relation to the height of the structure to be moved. For the April 3 and April 10 moves, Hinkel was concerned about any lines that were lower than 18 feet from the road, but he did not encounter any lines lower than 18 feet along the proposed route. Thus, based on NSM's

representation of the structures' heights, Hinkel determined there were no conflicts with CPU facilities.

Although CPU grants requests to move or shut down its facilities to accommodate structure moves, it does not have authority to approve or deny a proposed structure move. Instead, under CCC 10.06A.070, NSM applied for and received a County structure move permit. The CCC requires permits "for the movement of buildings and structures removed from their foundation" and provides that

> [a]rrangements for the disconnection and connection of any utilities or other facilities in the right-of-way shall be the responsibility of the permittee and any expenses in connection therewith shall be paid by the permittee. The permittee and/or permit applicant shall bring proof acceptable to the director of public works or his designee that demonstrates that the necessary arrangements with the utilities or other facilities have been made.

CCC 10.06A.070(b), (c)(11). All applicants for structure move permits from the County "must submit all information requested by the [County] related to the activity sought to be permitted before a permit can be issued. Failure to provide requested information will result in the denial of the permit application." CCC 10.06A.020.

On March 16, 2005, NSM submitted permit applications for the two structure moves and represented that the houses' heights were 17 feet, 6 inches. The applications included a "House Movers Check List" that required the applicant to (1) obtain information from CPU, the telephone company, and the cable company regarding any fee paid; (2) indicate whether the route was approved and whether any utility companies were going to assist; and (3) note any conditions or restrictions placed on the move. The application stated, "Please contact the utilities to obtain the following information. This information must be obtained before any County

permits will be issued." CP at 755. In this section of the applications, for each utility, NSM wrote "below utility wire height." CP at 755-56.

Sheila Ensminger, a County employee, reviewed and processed the applications. She stated that the structure mover was required to pre-run the proposed structure move route using a pole to measure the height of any low-hanging wires to determine whether arrangements needed to be made with the utilities. She also stated that the County relied on the accuracy of the applicant's measurements when processing a structure move permit application. Based on her training, the fact that the structures were shorter than 18 feet, 6 inches (which was the utility wire height), and given the information provided in NSM's structure move permit applications, Ensminger concluded that "there was no issue with utility wires" and did not request proof of arrangements with the utility companies. CP at 750. On April 1, 2005, Clark County issued the house move permits, one for April 3 and one for April 10.

Gary Boe of CPU conducted an incident report on the date of Smith's accident and recorded the house's height as 18 feet, 11 inches. When Boe made the measurement, the house was on a hydraulic jack that was raised approximately 4 to 6 inches. Thus, Boe stated that the house's height alone could have been as low as 18 feet 5 inches. Boe also measured the height of the utility lines at the site of the accident. The energized primary line was 23 feet, 7 inches above the road center line and the neutral line was 18 feet, 5 inches above the road center line.

It is a common practice for house movers to have employees on top of houses to move utility lines over the house. The Washington Industrial Safety and Health Administration (WISHA) requires a minimum clearance of 10 feet between a worker and an energized high-voltage electrical wire. WAC 296-155-428(1)(e)(i). At either the 17 feet, 2 inch height provided

6

to CPU or the 17 feet, 6 inch height provided to the County in NSM's application permit, the house's peak was within 6 feet of overhead high voltage lines.

Smith sued CPU and the County for negligence. He claimed that the County negligently issued the move permit. He also claimed that CPU negligently evaluated the proposed house move and failed to ensure compliance with statutory minimum clearance requirements for utility lines.

The County successfully moved for summary judgment, arguing that (1) it did not owe a duty to Smith under the public duty doctrine and (2) it did not owe a duty to Smith because the accident occurred on a state highway and "[t]he County does not have the authority to permit or regulate house moves on state highways." CP at 542. Smith and CPU responded that the County owed a duty to Smith under the "failure to enforce" exception to the public duty doctrine. CP at 417, 438.

The trial court concluded that the failure to enforce exception to the public duty doctrine did not apply because (1) the County did not have actual knowledge of a violation of CCC 10.06A.070 concerning permitting for house moves and (2) the County's duties under CCC 10.06A.070 were owed to the public in general, not to a specific individual. The trial court also concluded that the County did not have a duty with respect to the permitting of house moves on state roads and any negligence by the County in issuing a permit for the move was not the proximate cause of Smith's damages. Thus, the trial court dismissed all of Smith's claims against the County. Smith and CPU timely appeal the order granting the County's summary judgment motion.

CPU subsequently moved for summary judgment, arguing that under the public duty doctrine it owed no duty to Smith as an individual because it acted in a regulatory rather than in a

7

proprietary capacity when it reviewed whether the two house moves could proceed without conflicting with CPU's utility lines. The trial court denied CPU's motion, concluding that "CPU's acts were a combination of governmental and proprietary but were more proprietary than governmental. . . . [T]he acts were not so purely governmental in their nature so as to immunize CPU from liability." CP at 988.

The trial court certified its order denying CPU's summary judgment motion for discretionary review under RAP 2.3(b)(4).[3] We granted CPU's motion for discretionary review and consolidated the appeal with Smith's and CPU's appeal of the trial court's summary judgment dismissal of the County.

## ANALYSIS

### I. STANDARD OF REVIEW

We review a trial court's summary judgment order de novo, engaging in the same inquiry as the trial court. *Ruvalcaba v. Kwang Ho Baek*, 175 Wn.2d 1, 6, 282 P.3d 1083 (2012). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Visser v. Craig*, 139 Wn. App. 152, 157, 159 P.3d 453 (2007) (quoting CR 56(c)).

The moving party bears the burden of demonstrating that there is no genuine issue of material fact. *Atherton Condo. Apartment–Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990). "After the moving party submits adequate affidavits, the

---

[3] RAP 2.3(b)(4) provides that we may grant discretionary review if
> [t]he superior court has certified, or all the parties to the litigation have stipulated, that the order involves a controlling question of law as to which there is substantial ground for a difference of opinion and that immediate review of the order may materially advance the ultimate termination of the litigation.

nonmoving party must set forth specific facts which sufficiently rebut the moving party's contentions and disclose the existence of a genuine issue as to a material fact." *Meyer v. Univ. of Wash.*, 105 Wn.2d 847, 852, 719 P.2d 98 (1986). "If the nonmoving party fails to do so, then summary judgment is proper." *Vallandigham v. Clover Park Sch. Dist. No. 400*, 154 Wn.2d 16, 26, 109 P.3d 805 (2005).

We consider all evidence submitted and all reasonable inferences from the evidence in the light most favorable to the nonmoving party. *McPhaden v. Scott*, 95 Wn. App. 431, 434, 975 P.2d 1033 (1999). But a nonmoving party "may not rely on speculation[ or on] argumentative assertions that unresolved factual issues remain." *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986).

Here, the parties dispute whether the public duty doctrine precludes the County or CPU from owing a duty to Smith and, if not, whether the County or CPU negligently caused Smith's injuries. To prove an action for negligence, a plaintiff must demonstrate that the defendant owed a duty to the plaintiff, breached this duty, and that this breach proximately caused the plaintiff's injury. *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999). "Existence of a duty is a question of law. Breach and proximate cause are generally . . . questions for the trier of fact." *Hertog*, 138 Wn.2d at 275 (citation omitted).

> Once it is determined that a legal duty exists, it is generally the jury's function to decide the foreseeable range of danger, thus limiting the scope of that duty. In other words, given the existence of a duty, the scope of that duty under the particular circumstances of the case is for the jury.

*Briggs v. Pacificorp*, 120 Wn. App. 319, 322-23, 85 P.3d 369 (2003) (citation omitted). But if reasonable minds could not differ on the issues of breach and proximate cause, they may be determined as a matter of law. *Hertog*, 138 Wn.2d at 275.

9

II. THE PUBLIC DUTY DOCTRINE AND ITS CONTINUING VIABILITY

As a preliminary matter, Smith argues that the public duty doctrine should be abolished. But we are bound by our Supreme Court's holding that the public duty doctrine applies in the state of Washington. *See Babcock v. Mason County Fire Dist. No. 6*, 144 Wn.2d 774, 784–86, 30 P.3d 1261 (2001). Accordingly, we decline to consider this argument further.

III. THE FAILURE TO ENFORCE EXCEPTION DOES NOT APPLY TO THE COUNTY

Smith next argues that the public duty doctrine's failure to enforce exception applies because the County breached its mandatory duty to enforce the CCC 10.06A.020, 10.06A.030, and 10.06A.070(c)(11). CPU joins in these arguments. The County responds that the failure to enforce exception does not apply here because the CCC provisions involving structure move permit applications did not impose a mandatory and specific duty on the County. We agree with the County.

A determination of whether the CCC provisions imposed a mandatory duty on the County to deny NSM's permit application is a matter of statutory interpretation and a question of law that we review de novo. *Dot Foods, Inc. v. Dep't of Revenue*, 166 Wn.2d 912, 919, 215 P.3d 185 (2009). When interpreting a statute, our "fundamental objective is to ascertain and carry out the Legislature's intent, and if the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." *Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). "Under this plain meaning rule, examination of the statute in which the provision at issue is found, as well as related statutes or other provisions of the same act in which the provision is found, is appropriate as part of the determination whether a plain meaning can be ascertained." *State ex rel. Citizens Against Tolls (CAT) v. Murphy*, 151 Wn.2d 226, 242, 88 P.3d 375 (2004). "We give effect to all statutory

10

language, considering statutory provisions in relation to each other and harmonizing them to ensure proper construction." *Joy v. Dep't of Labor and Indus.*, 170 Wn. App. 614, 620, 285 P.3d 187 (2012), *review denied*, 176 Wn.2d 1021 (2013). We also avoid construing a statute in a manner that results in "unlikely, absurd, or strained consequences." *Glaubach v. Regence BlueShield*, 149 Wn.2d 827, 833, 74 P.3d 115 (2003).

Under the public duty doctrine's failure to enforce exception, "[a] public official owes a duty to an individual if (1) the official has a duty to enforce a statute, (2) the official has actual knowledge of a statutory violation, (3) the official fails to correct the violation, and (4) the plaintiff is within the class the statute protects." *Smith v. City of Kelso*, 112 Wn. App. 277, 282, 48 P.3d 372 (2002). "This exception applies only where there is a mandatory duty to take a specific action to correct a known statutory violation." *Donohoe v. State*, 135 Wn. App. 824, 849, 142 P.3d 654 (2006). "Such a duty does not exist if the government agent has broad discretion about whether and how to act." *Halleran v. Nu West Inc.*, 123 Wn. App. 701, 714, 98 P.3d 52 (2004). The plaintiff has the burden to establish each element of the failure to enforce exception. *Atherton*, 115 Wn.2d at 531. Courts construe the exception narrowly. *Atherton*, 115 Wn.2d at 531.

The CCC requires a permit "for the movement of buildings and structures removed from their foundation" and provides:

> Arrangements for the disconnection and connection of any utilities or other facilities in the right-of-way shall be the responsibility of the permittee and any expenses in connection therewith shall be paid by the permittee. The permittee and/or permit applicant shall bring proof acceptable to the director of public works or his designee that demonstrates that the necessary arrangements with the utilities or other facilities have been made.

CCC 10.06A.070(b), (c)(11). The CCC also provides that applicants for structure move permits from the County "must submit all information requested by the [County] related to the activity sought to be permitted before a permit can be issued. Failure to provide requested information will result in the denial of the permit application." CCC 10.06A.020.

Here, the County's permit application included a "House Movers Check List" that required the applicant to include information relating to CPU, the telephone company, and the cable company as to whether any fees were paid, whether the route was approved, whether there would be assistance from the utility companies, and any conditions or restrictions on the move. CP at 755-56. The application stated, "Please contact the utilities to obtain the following information. This information must be obtained before any County permits will be issued." CP at 755. In this section of the application, NSM wrote "below utility wire height" for each utility. CP at 755-56.

Smith contends that CCC 10.06A.070(c)(11) required the County to obtain information from NSM regarding arrangements with each utility. NSM's permit application included no information that necessary arrangements with the utilities had been made. Thus, according to Smith, the County breached its mandatory duty to deny the application.

Although CCC 10.06A.070(c)(11) contains the mandatory "shall" language with respect to the proof of arrangements with utilities, it states that the applicant "shall bring proof *acceptable to the director of public works or his designee* that demonstrates that the *necessary* arrangements with the utilities or other facilities have been made." (Emphasis added.) Thus, the provision's plain language affords the County broad discretion to determine (1) what, if any, arrangements with the utility are "necessary" and (2) what proof of those arrangements is "acceptable." CCC 10.06A.070(c)(11).

12

Furthermore, examining the provision as a whole, the first sentence of CCC 10.06A.070(c)(11) clearly states that making arrangements with utilities "shall be the responsibility of the permittee." Accordingly, we hold that CCC 10.06A.070(c)(11) imposes a duty on the permit applicant to make arrangements with utilities and to provide acceptable proof of those arrangements to the County. Any County action on the permit application based on the information provided by the applicant is discretionary.

Smith further contends that *Campbell v. City of Bellevue*, 85 Wn.2d 1, 530 P.2d 234 (1975) is instructive with regard to his argument. According to Smith, under CCC 10.06A.020, the County had a mandatory duty to deny the permit application because NSM omitted "requested information" regarding its arrangements with utilities.

In *Campbell*, a woman was electrocuted when she fell into a stream that contained a live electrical wire, and her estate sued the city of Bellevue for allowing the dangerous condition to persist. 85 Wn.2d at 4-5. Before the incident, a dead raccoon was discovered in the creek, and the woman who attempted to remove the raccoon received an electric shock. *Campbell*, 85 Wn.2d at 3. The city's electrical inspector inspected the site of the first incident and notified the landowner that the "[w]iring running thr[ough the] creek is unsafe and constitutes a threat to life. This situation will have to be corrected immediately or the service will be disconnected." *Campbell*, 85 Wn.2d at 3-4 (internal quotation marks omitted).

Despite the existence of a Bellevue Municipal Code (BMC) provision addressing this situation, the City took no further action to disconnect the wiring. *Campbell*, 85 Wn.2d at 4. Specifically, the BMC provision stated:

> "The building official shall have the authority to inspect[ ] any previously installed electrical equipment. . . . Should he find such installation or equipment to be manifestly unsafe to life or property, he shall serve written notice to the

13

owner and/or user thereof that such unsafe conditions exist and must be eliminated within a period of not to exceed sixty days. If such requirements are not complied with within the stated time, he *shall* disconnect or cause to be disconnected, the current from such installation or equipment."

*Campbell*, 85 Wn.2d at 6 (emphasis added) (quoting former BMC 16.32.110 (Ordinance 163, § 11 (June 12, 1956))). Our Supreme Court held that the city's electrical engineer knew of the danger posed by the electrical wires, but failed to comply with the ordinance requiring him to disconnect the wires upon finding that they were a threat to life. *Campbell*, 85 Wn.2d at 13. The ordinance was "not only designed for the protection of the general public but more particularly for the benefit of those persons or class of persons residing within the ambit of the danger involved." *Campbell*, 85 Wn.2d at 13.

Here, unlike the statute in *Campbell* that clearly required disconnection of the wiring upon a determination that it created a condition threatening to life, CCC 10.06A.020 states, "Failure to provide requested information will result in the denial of the permit application." The broad "[f]ailure to provide requested information" does not describe a specific duty that the County must perform, but instead states what will happen if the *applicant* fails to perform. The public duty doctrine's failure to enforce exception requires a "specific duty to take *corrective* action." *Ravenscroft v. Wash. Water Power Co.*, 87 Wn. App. 402, 415, 942 P.2d 991 (1997) (emphasis added), *aff'd in part, rev'd in part on other grounds by Ravenscroft*, 136 Wn.2d 911, 969 P.2d 75 (1998).

Although CCC 10.06A.020 provides that the County will deny a permit if the applicant fails to provide requested information, CCC 10.06A.070(c)(11) specifically allows the County to determine what is "acceptable" proof regarding the requested information. Moreover, whereas in *Campbell*, the city official made the necessary finding prerequisite to disconnecting the lines;

here, no County official determined that the information provided regarding arrangements with utilities was unacceptable under CCC 10.06A.070(c)(11). Thus, CCC 10.06A.070(c)(11) does not impose a mandatory duty on the County, and CCC 10.06A.020 does not impose a specific duty on the County with respect to the CCC violation alleged here.

Smith relies on two additional cases, *Bailey v. Town of Forks*, 108 Wn.2d 262, 737 P.2d 1257 (1987), 753 P.2d 523 (1988) and *Waite v. Whatcom County*, 54 Wn. App. 682, 775 P.2d 967 (1989), in which Washington courts have held that the failure to enforce exception applied. Both are distinguishable.

In *Bailey*, a woman was injured by a driver who was under the influence of alcohol while driving in the town of Forks. 108 Wn.2d at 263-64. A Forks police officer had previously seen the man and knew him to be intoxicated, but failed to take him into custody contrary to former RCW 70.96A.120(2) (1977), which provided that "a person who appears to be incapacitated by alcohol and who is in a public place . . . *shall* be taken into protective custody by the police or the emergency service patrol." *Bailey*, 108 Wn.2d at 264, 269 (emphasis added). The statute in *Bailey*, similar to that in *Campbell*, specifically delineated the trigger for the officer's duty (i.e., once an officer determined that an individual was publicly intoxicated, the officer had a statutory duty to take the intoxicated individual into custody). By contrast, here, CCC 10.06A.070(c)(11) merely defines what will happen if the applicant fails to provide "acceptable" proof to the County. Moreover, "[f]ailure to provide requested information" can encompass a broad spectrum of conduct and does not apply to the specific alleged failure on the County's part here—failure to receive specific information regarding arrangements with utilities. CCC 10.06A.020.

15

In *Waite*, a man was injured when he lit a propane furnace in his basement and the furnace exploded. 54 Wn. App. at 684. The Uniform Mechanical Code in effect at the time the injury took place prohibited the installation of propane furnaces in basements. *Waite*, 54 Wn. App. at 684. Before installation of the furnace, a county inspector had advised the contractor that the proposed installation complied with the mechanical code. *Waite*, 54 Wn. App. at 684. Division One of this court reversed the trial court's award of summary judgment to the county because the plaintiff raised a genuine issue of material fact regarding the inspector's actual knowledge of a code violation. *Waite*, 43 Wn. App. at 687. But in *Waite*, unlike here, the undisputed facts revealed a statutory violation and the court's reversal of summary judgment to the county was based on a factual dispute on the second element of the failure to enforce exception—actual knowledge of the statutory violation. Here, the issue is whether the CCC provisions cited by Smith imposed a mandatory duty on the county to act, a question of law that we have resolved in the County's favor.

Finally, Smith argues that "[a]t the least, the County had a duty to investigate and confirm that the wires would pose no danger," citing CCC 10.06A.030. Br. of Appellant Smith at 18. That provision states in part, "If the permit application requires an investigation, the permit application along with any supporting documents and information may be checked for accuracy and whether the activity is appropriate and consistent with the public health, safety and welfare." CCC 10.06A.030.

Contrary to Smith's contention that this provision imposed a mandatory duty to investigate, the provision's plain language states, "*If* the permit application requires an investigation, the permit application . . . *may* be checked for accuracy and whether the activity is appropriate and consistent with the public health, safety and welfare." CCC 10.06A.030

16

(emphasis added). Nothing in the provision imposes a mandatory duty on the County to check that NSM's representation that the structure was "below utility wire height" was accurate. *See also Meaney v. Dodd*, 111 Wn.2d 174, 180, 759 P.2d 455 (1988) ("A governmental authority is entitled to rely upon the statements made by a permit applicant and has no duty to verify them.").

Accordingly, we hold that CCC 10.06A.020, 10.06A.030, and 10.06A.070(c)(11) did not impose a mandatory and specific duty on the County to deny NSM's permit application; and thus, we hold that the trial court properly concluded that the public duty doctrine's failure to enforce exception did not apply. Because the public duty doctrine applies here, we hold that the trial court properly granted the County's summary judgment motion and dismissed Smith's claims against it.

IV.    CPU'S LIABILITY

CPU argues that (1) it did not have a duty to Smith under the public duty doctrine because it acted in a governmental capacity when it reviewed the proposed route in the present case; (2) regardless of the public duty doctrine, CPU owed no duty to Smith because it was NSM's sole responsibility to ensure Smith's safety; and (3) even if CPU owed a duty to Smith, it did not breach that duty as a matter of law. Smith responds that (1) the public duty doctrine does not apply because CPU's involvement in the house moves was proprietary in nature; (2) NSM's duty to enforce workplace safety laws does not preclude CPU from having a duty of care as an electrical utility; and (3) there are issues of material fact regarding the scope of CPU's duty and whether it was breached. We agree with Smith.

A. CPU Performed a Proprietary Function When Reviewing the Structure Move

CPU argues that it performed a governmental function when it reviewed the proposed structure move because it reviewed the move for public safety purposes. Smith responds that

17

CPU acted in a proprietary capacity when it reviewed the proposed structure move because the purpose of reviewing the move was to prevent damage to CPU's facilities and to avoid disruption of service to its customers.

In addition to the public duty doctrine's "exceptions," the doctrine does not apply when the government is performing a proprietary function. *Bailey*, 108 Wn.2d at 268. "A public entity acts in a proprietary rather than a governmental capacity when it engages in businesslike activities that are normally performed by private enterprise." *Stiefel v. City of Kent*, 132 Wn. App. 523, 529, 132 P.3d 1111 (2006). "The principal test in distinguishing governmental functions from proprietary functions is whether the act performed is for the common good of all, or whether it is for the special benefit or profit of the corporate entity." *Okeson v. City of Seattle*, 150 Wn.2d 540, 550, 78 P.3d 1279 (2003). If the governmental entity is performing a proprietary function, it is "held to the same duty of care as private individuals or institutions engaging in the same activity." *Bailey*, 108 Wn.2d at 268. "A city's electric utility serves a proprietary function of the government." *Okeson*, 150 Wn.2d at 550.

By contrast, "[g]overnmental functions are those generally performed exclusively for governmental entities." *Stiefel*, 132 Wn. App. at 529. Governmental functions tend to involve activities ensuring compliance with state law; issuing permits; or performing activities for the public health, safety, and welfare. *See Okeson*, 150 Wn.2d at 551 (operating street lights); *Stiefel*, 132 Wn.2d at 529-30 (operating a fire department); *Taylor v. Stevens County*, 111 Wn.2d 159, 164-65, 759 P.2d 447 (1988) (issuing building permits and conducting building inspections); *Dorsch v. City of Tacoma*, 92 Wn. App. 131, 136, 960 P.2d 489 (1998) (issuing electrical permits); *Moore v. Wayman*, 85 Wn. App. 710, 716, 934 P.2d 707 (1997) (building code inspections).

18

In providing certain utilities, a governmental entity may act in both a governmental and a proprietary capacity. *See Okeson*, 150 Wn.2d at 550-51 (municipal electric utility is proprietary function; provision and maintenance of streetlights is governmental function); *Stiefel*, 132 Wn. App. at 530 (operation of municipal water system is proprietary function; failure to maintain adequate water supply to fire hydrant is governmental function). Thus, because the same utility can perform both governmental and proprietary functions, "application of the public duty doctrine depends on the particular function being challenged." *Stiefel*, 132 Wn. App. at 530.

Here, Hinkel, a CPU associate design engineer, testified that the reason CPU performed route checks for structure moves was to ensure contractor and general public safety, to prevent damage to its facilities, and to prevent interruption of service to customers. Thus, there were both proprietary and governmental functions to CPU's review of proposed structure move routes.

CPU contends that when there are both proprietary and governmental components of a government entity's activity, "the critical issue is not the predominant character of the activity, but rather the target of the plaintiff's allegations." Br. of Appellant CPU at 15. Relying on *Stiefel*, CPU argues that because Smith alleges that CPU was negligent for failing to protect him from electric shock, not for failing to protect its facilities for the benefit of customers, the utility was performing a governmental function.

CPU misinterprets *Stiefel* and other cases discussing governmental entities performing dual functions. In *Stiefel*, Division One noted that "where a public entity acts in a dual capacity, application of the public duty doctrine depends on the particular function being challenged." 132 Wn. App. at 530. Contrary to CPU's interpretation of this statement, the *Stiefel* court merely stated the general rule that in determining whether the government performed a proprietary function, we look to the type of governmental activity that allegedly caused the plaintiff's injury.

19

We do not, as CPU contends, determine whether the government performed a proprietary function based on the type of injury the plaintiff suffered in a particular case. Were the rule to be such, a governmental entity would be shielded from liability any time a plaintiff was physically injured because the injury could be linked to the government's failure to protect the public health, safety, and welfare, which is generally a governmental function.

CPU contends that *Dorsch*, in which we held that the city of Tacoma acted in a governmental capacity when approving an electrical permit, is "particularly analogous." Br. of Appellant CPU at 14. In that case, an advertising company applied to the city of Tacoma for an electrical permit to illuminate a billboard, and the city approved the application. *Dorsch*, 92 Wn. App. at 133. One of the company's employees subsequently received an electrical shock and died of his injuries while working on the billboard. *Dorsch*, 92 Wn. App. at 133. The employee's wife sued the city and we affirmed the trial court's dismissal of the suit based on the public duty doctrine. *Dorsch*, 92 Wn. App. at 133, 136. We held that because the Tacoma Municipal Code provision under which the city granted the permit was for the purpose of protecting the public health, safety, and welfare, the city's action in approving the permit was governmental and, thus, the city was not liable. *Dorsch*, 92 Wn. App. at 136. We noted:

> In considering the [permit] request, the City assesses the practicality of the proposed use, giving due regard to the potential of hazard. Contrary to Dorsch's assertion that the City is engaged in selling and distributing electricity, the City acts more in a regulatory manner by initially determining whether the proposed use may be accomplished safely. Therefore, approving the electricity use to illuminate the billboard is a noncommercial, governmental function uniquely within the regulatory power of the municipal authority.

*Dorsch*, 92 Wn. App. at 136.

But here, unlike in *Dorsch*, CPU concedes that it "lacks permitting authority over a structure move and is not required by any statute, regulation, or ordinance to review, evaluate,

supervise, or otherwise address a structure move." Br. of Appellant CPU at 15. Thus, unlike in *Dorsch* and similar cases involving building inspections and permits, CPU was not primarily concerned with ensuring compliance with state law and was not authorized to approve or deny the structure move. Therefore, although Hinkel stated that one of the purposes for reviewing the structure move route was to ensure the safety of the public and NSM's employees, that concern was not specifically stated in an authorizing statute as in *Dorsch*. Furthermore, Hinkel stated that one of CPU's concerns with the structure move was damage to its facilities and its responsibilities to its customers, a uniquely proprietary function not present in *Dorsch*. Accordingly, we hold that CPU performed a proprietary function when it reviewed NSM's proposed structure move and that the trial court properly concluded that the public duty doctrine did not bar Smith's suit against CPU.

B. CPU's Duty

CPU next argues that even if the public duty doctrine does not apply, it had no duty to Smith as a matter of law because any duty to ensure compliance with jobsite safety regulations belonged solely to NSM. We disagree.

WISHA generally imposes a duty to ensure compliance with safety regulations on employers. RCW 49.17.060(2) provides that "[e]ach employer. . . [s]hall comply with the rules, regulations, and orders promulgated under this chapter." The regulations promulgated under WISHA specifically require employers to ensure minimum clearances between their employees and hazardous electrical lines:

> No person, firm, corporation, or agent of same, shall require or permit any employee to perform any function in proximity to electrical conductors or to engage in any excavation, construction, demolition, repair, or other operation, unless and until danger from accidental contact with said electrical conductors has

been effectively guarded by de-energizing the circuit and grounding it or by guarding it by effective insulation or other effective means.

WAC 296-155-428(1)(b). The regulations also require a minimum clearance of 10 feet over equipment and materials for high voltage power lines. WAC 296-155-428(1)(e). Thus, to the extent that Smith claims that CPU had a duty to ensure proper clearance above structures being moved in its jurisdiction and the employees involved in those moves, CPU is correct that the claim fails because it was clearly NSM's duty to comply with the regulations.

CPU argues that it has no duty to enforce workplace safety laws. But the issue here is not whether CPU had a duty to enforce workplace safety laws. Rather, the issue is whether CPU had a duty to perform its review of the house move with reasonable care.

An electric utility's duty of care with respect to the construction and maintenance of its lines varies according to the danger posed by the utility's activity. *Keegan v. Grant County Pub. Util. Dist. No. 2*, 34 Wn. App. 274, 279, 661 P.2d 146 (1983). "If the danger is minimal, the utility is held to conventional negligence concepts. But when . . . the utility's operation exposes the public to serious accidents or death, the utility is held to the highest degree of care human prudence is equal to." *Keegan*, 34 Wn. App. at 279. Here, CPU had a duty to operate the high voltage lines that injured Smith with "the highest degree of care human prudence is equal to." *Keegan*, 34 Wn. App. at 279.

Smith contends that CPU had the additional duty "to control its own facilities to ensure their operation and to inform NSM if they posed a danger," but he fails to provide any support for imposing this specific duty on CPU. Cross-Response/Reply Br. of Smith at 33. In making this assertion, Smith conflates the issue of whether CPU had a duty to Smith at all with the issue of the scope of that duty and whether it was breached, both of which are fact issues not properly

22

decided on summary judgment. *Briggs*, 120 Wn. App. at 322. Accordingly, we hold that the trial court did not err when it denied CPU's summary judgment motion.

C. Breach

Finally, CPU argues that even if it owed a duty to Smith, it did not breach that duty as a matter of law because it had no duty to verify the information NSM provided. We disagree.

CPU argues that because NSM informed CPU that it measured the entire route and its structure was below utility wire height, CPU had no duty to verify that information and, thus, reasonable minds could not conclude that CPU breached its duty. CPU is correct that "[a] governmental authority is entitled to rely upon the statements made by a permit applicant and has no duty to verify them." *Meaney*, 111 Wn.2d at 180. But the question of whether CPU breached its duty requires a more involved factual inquiry than merely determining whether CPU was required to verify the information NSM provided.

In addition to Smith's claims that CPU should have verified the information's accuracy, Smith presented evidence that CPU should have had one of its employees present on the date of the move for safety purposes and that the accident would not have happened had a CPU employee been present. He also presented evidence that CPU should not have removed the guy stubs until it had a complete route map from NSM.

The parties dispute the scope of CPU's duty, creating a question of fact that must be submitted to the jury. *Briggs*, 120 Wn. App. at 322. Accordingly, we hold that there are genuine issues of material fact remaining as to the scope of CPU's duty and whether CPU breached that duty and, thus, the trial court did not err when it denied CPU's summary judgment motion.

No. 41811-8-II consolidated with No. 42231-0-II

We affirm both the trial court's order granting summary judgment dismissing the County and the trial court's denial of CPU's summary judgment motion. We remand for trial on the remaining issues.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

LEE, J.P.T.

We concur:

WORSWICK, C.J.

JOHANSON, J.